CAMPBELL v. THE CITY OF ST. LOUIS *et al.*, *Appellants.*

**Power to Contract and Adjust Claims for Public Printing in St. Louis.** Under the charter of the city of St. Louis as revised and amended in 1870,(Sess. Acts, p. 485, art. 11, §§ 1, 2, 3, 4, 5,) the comptroller, and not the city council, had power to contract for the public printing. If a controversy arose between the city and the printer as to the amount due for work done under a contract, the council had no power to adjust the dispute.

*Appeal from St. Louis Court of Appeals.*

AFFIRMED.

The plaintiffs filed a petition in behalf of themselves and all other citizens and taxpayers of the city of St. Louis charging that the city was a municipal corporation, whose corporate powers were defined by its charter; that plaintiffs were resident citizens and taxpayers of the city; that the defendants are respectively the city, its auditor, its comptroller, its treasurer and the Times Company of St. Louis; that by the charter of the city the legislative power is vested in the city council, which has power to levy taxes and appropriate the money when levied according to the exigencies of its charter; that the Times Company is a corporation publishing a newspaper in the city of St. Louis; that about the 27th day of May, 1873, said Times Company, according to the charter of the city, made a contract with said city for doing all the city printing for one year from date, and until its successor should be selected and qualified, at the uniform price of five cents per line nonpareil; that in May, 1874, said Times Company was required by said city to do, and did do, certain printing under said contract amounting according to the contract to the sum of $1,389.71, which was paid by the city; that the Times Company claimed the additional sum of $503.61 for said printing, which claim was made on the fraudulent and unjust pretense that said Times Com-

pany was entitled to charge double price per line nonpareil for certain portions of said printing consisting of what was called rule and figure, or tabular work; that the city council, on the 10th day of July, 1874, adopted a resolution that the "said company be allowed payment in full for printing on their scale of prices for tabular matter," and in February, 1875, passed an ordinance for the relief of the Times Company, ordaining that the city auditor be directed to draw his warrant in their favor for $503.61, and making an appropriation for such payment, which ordinance was approved by the mayor; that under color of this ordinance the auditor of the city was about to draw his warrant for $503.61 on the treasurer to be paid by him out of the funds of the city collected by taxation for corporate and municipal purposes thereof, and set apart for printing and stationery, which warrant would be countersigned by the comptroller and paid by the treasurer unless restrained by order of court; that the Times Company had no legal or equitable right to claim this sum of $503.61, nor had the city council any authority to pass the ordinance or appropriate any money in satisfaction of the claim; that such appropriation would be illegal, unauthorized and a waste of the city's money; and the petition asked for a restraining order. To this petition there was a general demurrer, which was sustained by the court, and the petition was dismissed. On appeal to the court of appeals this judgment was reversed. Defendants then appealed to this court.

*Marshall & Barclay* for appellants.

*Samuel Reber* for respondents.

PER CURIAM.—This was a proceeding to enjoin the city of St. Louis from paying and the St. Louis Times Company from receiving $503.61 on a printing contract between the city and said company, which the latter claimed on the ground that it was entitled to charge double price per line

nonpareil for certain portions of said printing consisting of rule and figure, or tabular work. The city council, on the 18th day of July, 1874, adopted a resolution that the said company be allowed payment in full for printing on their scale of prices for tabular matter, and in February, 1875, passed an ordinance for the relief of the Times Company, ordaining that the city auditor be directed to draw his warrant in favor of the Times Company for $507.61, and making an appropriation for such payment, which ordinance was approved by the mayor. Alleging that the Times Company had received all that it was entitled to under the contract, the petition states that the auditor was about to draw his warrant on the treasurer for said additional sum, which the comptroller would countersign and the treasurer pay; that the said company had no right to claim that sum, nor the city council authority to pass the said ordinance. A demurrer was sustained to the petition, and on appeal to the court of appeals, that judgment was reversed and the defendants have appealed to this court. The court of appeals held that the city council had no power to make the original contract, but that to the comptroller, under the charter of the city, the power belonged, and that if that contract did not cover the work for which the extra price was claimed, the city council could not, under the charter, make any agreement to allow it, or pass any ordinance appropriating money for its payment. The opinion of the court by Gantt, Judge, is so clear and conclusive on the questions involved, that we deem it unnecessary to do more than refer to, and adopt it. Judgment affirmed.

GANTT, P. J., delivering the opinion of the court of appeals, said:

I. The circuit court, in sustaining the demurrer, asserted the power of the city council to make what appears on the record to be a donation of public money to a party not entitled to receive it by virtue of any legal claim. Evi-

dently the power asserted has this extent; for the petition is explicit that the Times Company has received all which under its contract it was entitled to demand, that in full view of this fact the council awarded to it a further sum, which was demanded without warrant of law and in contravention of the terms of the contract made by the Times Company for the doing of the city printing. If the city was bound by its charter to make contracts in the manner herein prescribed for the doing of all such work, and had no right to pay money except in pursuance of such a contract, the demurrer should have been overruled, unless some other cause not yet considered existed for sustaining it. That the city had no power to make a donation to give the funds in its treasury to whomsoever, as a mere gratuity, is well settled. *Hitchcock v. The City*, 49 Mo. 484. It is extraordinary that so anomalous a power should ever have been gravely asserted. It is totally inconsistent with the idea of constitutional and legal government. It would place all the property of a municipality at the mercy of a corrupt board of managers, by whatever name they might be known, and would reduce all taxpayers of such a municipality to a condition in which they might look with envy upon the subjects of any tolerably administered despotism.

II.   The 2nd section of the 11th article of the charter of St. Louis, (Sess. Acts 1870, p. 485,) declares "The parties having the contract for the public printing of the city shall do all the job work required to be done by law or ordinance, or which is to be paid for by the city directly or indirectly, and it shall not be lawful to cause any printing to be done or paid for except in the manner authorized by this article." Looking then to the mode prescribed by article 11 for causing to be done or paying for the printing of the city, we find that section 1 provides that "the contract for all city printing shall be entered into by the comptroller as follows," &c., &c. Then follow rules for awarding work to the lowest and best bidder, "provided that until

the awards are confirmed, the comptroller," (not the city council) " may contract for the city printing in the meantime." Section 3 ascertains what shall be printed and how soon. Section 4 declares the manner in which the reports of the mayor and other officers shall be printed and when. Section 5 directs that all printing required by law, ordinance or the officers of the city, and the purchase of all the stationery shall be done under the supervision of the register, &c. " And no publication or printing of reports or statements of officers shall be permitted or paid for except when done in the manner herein described."

It thus appears that great care has been taken to prevent any city printing whatever to be done or paid for except by virtue of a contract to be awarded to the lowest and best bidder; that to the comptroller, and not the city council, is given the power of making any such contract; and that it is industriously declared that it shall not be lawful to cause any printing to be done or paid for except as authorized by article 11. Language can hardly be more pointed or guarded. Any one unacquainted with the past history of St. Louis would, on examining the charter, be apt to conclude that great abuses in times past had admonished those in charge of the interests of the city, of the danger of committing the power of contracting or paying for city printing to the legislative body, and the expediency of conferring it upon an officer who was required to give security for the faithful performance of his duties. This intention appears on the face of the charter of 1870 as clearly as if it had been stated in a formal preamble. The city council, then, is absolutely forbidden to cause any printing to be done or paid for except, &c., &c. When printing has been done according to the terms of article 11 the city council may and must appropriate money for its payment. But everything beyond this is *ultra vires*.

Even if it were true that (in some manner certainly not shown by the present record) the city had incurred a liability to the Times Company, by reason of transactions

not within the scope of article 11, it would be wholly in-admissible for the city council under the prohibitions of the charter to assume to do by indirection what is directly and expressly forbidden to any functionary of the city government or all of them together, and to appropriate money for the satisfaction of the demand.    The plain duty of the council would be to refer the subject to the courts of the State; and where it attempts, in place of this, to determine the validity of the claim and provide for its payment, it is guilty of a plain usurpation of power and a wanton waste of the money of the city.

III.    It is, however, contended that the council has power to compromise a claim made against the city, and that the ordinance may be justified under this power.    We cannot see how this power can be claimed in the face of the positive prohibitions of section 2, article 11; and we are of opinion that none of the authorities relied on by the respondent will support the pretension.    We cannot see to what purpose our attention is called to the founda-tions on which all contracts must rest when the parties to them have full power to contract, for in the present in-stance we have to deal with a disability on the part of one claiming to be a contracting party, to make any contract whatever.    If we were considering the true construction of a general grant of power without especial limitations we would be engaged in a task very different from that which now occupies us.

The counsel for respondents calls our attention to sec-tion 1, article 1, of the revised charter of the city.    This section confers on the city the power to sue and be sued, to levy and collect taxes, to appropriate the money of the city, and thence he argues that whereas a dispute had arisen between the city and Times Company growing out of a lawful contract, to settle which the parties might have had a recourse to a court of justice, therefore, the city had a right to settle and adjust it by compromise out of court. We are surprised that it did not occur to the learned coun-

sel ˙ that this argument by proving too much, proves nothing. If it has any force, the council might have dispensed altogether with the partial contract made by the . comptroller. The contract made either did or did not cover the work for which an extra price is claimed. If it did cover it, there is no shadow of foundation for any payment not contemplated by the contract. If it did not cover it, in respect of this work there was no contract, and yet the council undertakes to pay for work which has not been done as provided by article 11; that is, undertakes to do what section 2 of that article expressly forbids.

We are indisposed to enter upon an examination we do˙not think relevant. It is, of course, quite clear that if A and B, being under no disability to contract, have entered into an agreement, it may, so long as it remains executory in whole or in part, be rescinded by mutual consent, and this mutual consent to rescind may, so long as there is something on each side to be done or forborne, form an adequate legal consideration for the rescission. But it is quite otherwise when the contract has been fully executed by either party. Then a definite right to a definite thing or sum has accrued ; neither more nor less than this is claimable and any agreement by the party liable to pay it, to pay anything further must either rest on some new consideration or be *nudum pactum.* When the party attempting to do what then becomes necessary, *i. e.* to make a new contract in respect of the excess, is by law disabled from making any contract whatever on the subject, it is obviously idle to consider, what he ought to do if he were free from the disability.

Therefore, we are of opinion that the city council had no power to make any contract whatever in relation to the city printing, that power being given exclusively to the comptroller; that it was moreover and industriously forbidden to pay any money for city printing except on contracts made by the comptroller pursuant to article 11; that according to the allegation of the petition the city

council is attempting either to make an independent contract with the Times Company and to pay the city's money under the contract, or else to pay out the city's money to the Times Company without any contract at all; that in either case it is attempting to do something for which not only no express power exists, but which it has been expressly forbidden to do; that the case before us is, in the language of the Supreme Court of Missouri, (*Hooper v. Ely*, 6 Mo. 505, 508, *loc. cit.*) " not a case of an injudicious exercise of a given power, but a naked assumption of power which it is our duty to check."